UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MBIA INSURANCE CORPORATION AND LACROSSE FINANCIAL PRODUCTS, LLC<br><br>          Plaintiffs,<br><br>     -against-<br><br>ROYAL BANK OF CANADA AND RBC CAPITAL MARKETS CORPORATION,<br><br>          Defendants. | 09 CV 5044 (KMK) (LMS)<br><br>**ANSWER AND COUNTERCLAIMS OF DEFENDANT ROYAL BANK OF CANADA**<br><br>**TRIAL BY JURY DEMANDED** |

    Defendant Royal Bank of Canada ("RBC"), by and through its attorneys, Chadbourne & Parke LLP, answers the Summons with Notice (the "Summons") filed by plaintiffs MBIA Insurance Corporation ("MBIA") and LaCrosse Financial Products, LLC ("LaCrosse") (collectively "Plaintiffs") as follows:[1]

    1.  Denies each and every allegation in the Summons in its entirety, except admits that RBC and LaCrosse entered into three credit default swap contracts, defined in the Summons as "CDS Contracts" (referred to herein as the "ISDA Master Agreements"), to which MBIA is not a party, and avers that RBC and MBIA entered into three financial guaranty insurance policies under which MBIA is obligated to pay money to RBC in the event that LaCrosse defaults in its obligations to RBC under the ISDA Master Agreements.

---

[1] Defendant RBC Capital Markets Corporation ("RBCCMC") does not answer the Summons and instead has moved to dismiss the Summons pursuant to Rule 12(b) of the Federal Rules of Civil Procedure because RBCCMC is not a party to any of the agreements in dispute.

2. RBC further avers that upon entering into each of the ISDA Master Agreements, the securities in the collateral pool were agreed to and accepted by LaCrosse and MBIA. Additionally, RBC avers that all securities added to the collateral pool, or otherwise changed or substituted during the ramp-up period, were verified by Deutsche Bank, AG ("Deutsche Bank") as Verification Agent pursuant to the terms of the Verification Agency Agreements to which LaCrosse is a party.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

3. The Summons fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

4. Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE

5. Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

6. Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

### FIFTH AFFIRMATIVE DEFENSE

7. Plaintiffs' claims are equitably estopped.

### SIXTH AFFIRMATIVE DEFENSE

8. Plaintiffs' claims are barred, in whole or in part, because of Plaintiffs' failure to mitigate their damages, if any.

## SEVENTH AFFIRMATIVE DEFENSE

9. Plaintiffs' claimed injuries, if any, were caused, in whole or in part, by Plaintiffs' actions and/or omissions.

## COUNTERCLAIMS

## NATURE OF THIS ACTION

10. Defendant RBC's Counterclaims arise out of Plaintiffs' unequivocal statement that they are not obligated to pay and will not pay the amounts that will soon become due and owing to RBC under the express terms of three ISDA Master Agreements entered into by and among RBC and LaCrosse and three corresponding Financial Guaranty Insurance Policies executed by MBIA.

11. Plaintiffs' claims that RBC breached the ISDA Master Agreements are unfounded, belied by the facts, and represent a transparent attempt by Plaintiffs to avoid their respective obligations to pay RBC the substantial amounts that will soon become due and owing under the ISDA Master Agreements. RBC's total damages arising from Plaintiffs' respective breaches of the ISDA Master Agreements and Financial Guaranty Policies, including any mark to market payments that would be due under the ISDA Master Agreements and Financial Guaranty Policies on an early termination, will exceed $2,000,000,000 (two billion dollars).

12. This action was removed to the United States District Court from the Supreme Court of the State of New York, Westchester County, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.

## PARTIES

13. Plaintiff MBIA Insurance Corporation is a corporation organized under the laws of the State of New York, with its principal place of business in Armonk, New York. MBIA is one of the nation's largest monoline insurers, providing insurance on bonds and similar obligations against the risk of nonpayment of principal and/or interest by the issuer. Upon information and belief, MBIA is also a significant provider of financial guarantee insurance policies in credit default swap transactions.

14. Plaintiff LaCrosse Financial Products, LLC is a Delaware limited liability company with its principal place of business in New York. Upon information and belief, LaCrosse was formed as a special purpose entity to act as a counterparty for structured derivative products, primarily credit default swaps. Under the ISDA Master Agreements, LaCrosse is sometimes referred to as the Seller or the Floating Rate Payer.

15. Defendant Royal Bank of Canada is a chartered bank incorporated under the laws of Canada, named in Schedule I to the "Bank Act" (S.C. 1991, c. 46), with its head office in Montreal and its principal place of business in Toronto, Canada. Under the ISDA Master Agreements, RBC is sometimes referred to as the Buyer or the Fixed Rate Payer.

16. Defendant RBC Capital Markets Corporation is a corporation organized under the laws of the State of Minnesota with its principal place of business in New York.

## STATEMENT OF FACTS

17. RBC and LaCrosse entered into three ISDA Master Agreements on September 26, 2005 ("Master Agreement I"), May 4, 2006 ("Master Agreement II"), and July 5, 2007

("Master Agreement III"), respectively (collectively, the "ISDA Master Agreements"), each of which is attached hereto as Exhibits A, B, and C respectively.

18. Each of the ISDA Master Agreements out of which RBC's Counterclaims arise, consists of three parts: a Master Agreement, a Schedule and a Confirmation, which collectively set forth the respective rights and obligations of the parties with respect to certain credit default swap transactions.

19. In conjunction with each of the respective ISDA Master Agreements, MBIA executed three Financial Guaranty Insurance Policies on September 26, 2005 ("Guaranty I"), May 4, 2006 ("Guaranty II"), and July 5, 2007 ("Guaranty III"), respectively (collectively, the "Financial Guaranty Policies"), each of which is attached hereto as Exhibits D, E, and F respectively. Under the Financial Guaranty Policies, MBIA provided financial guarantee insurance coverage to RBC in the event of LaCrosse's nonpayment of its contractual obligations under the ISDA Master Agreements.

20. The purpose of credit default swap transactions is to manage or trade the risk of a reduced or delayed payment on, or change in value of, a financial instrument. That reduced or delayed payment on, or change in value of, a financial instrument is defined in the relevant agreements and is referred to as a credit event (the "Credit Event").

21. For example, if the issuer or a person obligated to make a payment on a debt obligation, fails to make such a payment, becomes insolvent, declares bankruptcy or is the subject of some other specified Credit Event, the credit default swap transaction will result in a payout, subject to any contractually required conditions.

5

22. Although there are significant differences, credit default swap contracts have been compared to insurance contracts where the buyer pays a premium, and receives a sum of money if a specified event occurs.

23. In the transactions that are the subject of these Counterclaims, RBC, as Fixed Rate Payer, is obligated, inter alia, to make payments to LaCrosse on a quarterly basis (the "Fixed Amount Payments"). For example, in 2008 RBC paid to LaCrosse nearly $4,000,000 (four million dollars) in Fixed Amount Payments.

24. Likewise, LaCrosse, as Floating Rate Payer, has, inter alia, a corresponding obligation to pay to RBC a sum of money (the "Cash Settlement Amount") if specified Credit Events occur during the relevant time period relating to any of the agreed portfolio of reference obligations; provided that RBC complies with certain Credit Event notice requirements set forth in the ISDA Master Agreements. The Cash Settlement Amounts become due once the aggregate amount of reference obligations for which there is a Credit Event reaches a certain defined threshold, sometimes referred to as the "attachment point."

25. To submit a claim for the occurrence of a Credit Event, RBC is required to comply with certain conditions to settlement, including providing LaCrosse with Credit Event Notices and Notices of Publicly Available Information.

26. The specified Credit Events set forth in the ISDA Master Agreements are an ABS Failure to Pay Principal, an ABS Failure to Pay Interest, and an Irreversible Loss Writedown.

27. An ABS Failure to Pay Principal, which is defined in the Confirmations to the ISDA Master Agreements, means generally the failure of the obligor to pay principal to the holder of the underlying reference obligation. An ABS Failure to Pay Interest likewise means generally the failure of the obligor to pay interest to the holder of the underlying reference obligation.

28. An Irreversible Loss Writedown, which is also defined in the Confirmations to the ISDA Master Agreements, means, in essence, the irreversible reduction in the principal amount of the underlying reference obligation.

29. The Confirmations to the ISDA Master Agreements also require RBC to send a Notice of Publicly Available Information, for the purpose of confirming the occurrence of the Credit Event.

30. The Publicly Available Information (as defined in the Confirmations) in that notice could come from the monthly report generated by the trustee of each underlying reference obligation, sometimes called a "Trustee Report," which is the public source that RBC has used to satisfy its contractual obligations in connection with the Notices of Publicly Available Information.

31. RBC has performed and continues to perform its obligations under the ISDA Master Agreements, including making Fixed Amount Payments each quarter on the Fixed Rate Payment Dates and providing LaCrosse with timely and complete Credit Events Notices and Notices of Publicly Available Information.

32. The first such Credit Event Notice and Notice of Publicly Available Information was transmitted to LaCrosse by RBC on or about December 3, 2007.

33. Indeed, over an approximately eighteen month period, LaCrosse accepted RBC's approximately fifty Credit Event Notices and Notices of Publicly Available Information without asserting any objections.

34. In addition to RBC's obligation to send notices to LaCrosse, Deutsche Bank, as Verification Agent, was obligated, <u>inter alia</u>, to verify the validity of each Credit Event, Credit Event Notice, and Notice of Publicly Available Information provided by RBC to LaCrosse.

35. Deutsche Bank's duties as Verification Agent arise under the three Verification Agency Agreements entered into by and between RBC, as Swap Counterparty, LaCrosse, as the Super Senior Swap Counterparty, and Deutsche Bank, as Verification Agent, which correspond to the three ISDA Master Agreements.

36. In accordance with its obligations under the ISDA Master Agreements and the Verification Agency Agreements, Deutsche Bank verified the Credit Events and corresponding Credit Event Notices and Notices of Publicly Available Information provided by RBC to LaCrosse.

37. Upon information and belief, LaCrosse accepted Deutsche Bank's verifications without objection.

38. RBC continued to send to LaCrosse notices in substantially the same form over an approximately eighteen month period and Deutsche Bank continued to verify the Credit Events and accept the notices without objection.

39. It was not until February 2009, when the attachment point for Master Agreement III was approaching and a Cash Settlement Amount payment from LaCrosse was imminently due, that LaCrosse claimed, for the very first time, that RBC's Credit Event Notices -- many of which were sent to LaCrosse and verified by Deutsche Bank more than a year earlier -- were somehow deficient and thus null and void. LaCrosse's dilatory objections to the notices were nothing more than a pretext to avoid paying its contractual obligations to RBC.

40. Thereafter, on March 23, 2009, LaCrosse sent fifty-eight letters to RBC and Deutsche Bank objecting to the Credit Event Notices and Notices of Publicly Available Information (and, in some instances, the Credit Events themselves) (the "March 23 Letters").

41. For example, on March 23, 2009, LaCrosse objected to the Credit Event Notice and Notice of Publicly Available Information that RBC had provided on or about December 3, 2007.

42. LaCrosse's objection to the December 3, 2007 notices, nearly a year and a half after it received the notices, is commercially unreasonable.

43. In fact, from December 2007 until February 2009, LaCrosse had not once objected to any of the approximately fifty Credit Event Notices or Notices of Publicly Available Information that RBC had provided.

44. On March 30, 2009, LaCrosse sent an additional forty letters to RBC and Deutsche Bank raising the same objections to certain other Credit Events, Credit Event Notices and Notices of Publicly Available Information transmitted by RBC (the "March 30 Letters").

9

45. LaCrosse's purported objections are commercially unreasonable because they are untimely, non-substantive and overly technical in nature, and clearly asserted solely for the readily apparent and improper purpose of avoiding paying Cash Settlement Amounts that will soon become due and owing to RBC.

46. For each Credit Event Notice that LaCrosse claims is defective, RBC provided all of the information required by the 2003 ISDA Credit Derivatives Definitions, published by the International Swaps and Derivatives Association, Inc. (the "2003 Definitions"). Indeed, LaCrosse's letters objecting to the Credit Event Notices actually confirm that RBC identified, as required, the types of Credit Events, the dates of the Credit Events, and the names of the reference obligations to which the Credit Events related.

47. For example, LaCrosse sent a letter on March 23, 2009 regarding "Broderick CDO II Ltd 2006-2X Notice dated August 15, 2008," stating that "[t]he Notice is devoid of any detail; rather it perfunctorily states only that a 'Failure to Pay Interest Credit Event occurred' on August 1, 2008." That letter further confirms RBC's identification of the relevant reference obligation. Despite LaCrosse's characterization of RBC's Credit Event Notice as perfunctory, the notice fully complied with all of the requirements set forth in the governing 2003 Definitions. Moreover, this identical form of Credit Event Notice had been accepted on numerous occasions by LaCrosse beginning in December 2007.

48. In response to the March 23 Letters and the March 30 Letters, on April 24, 2009, RBC sent LaCrosse a letter objecting to LaCrosse's position that any of the Credit Event Notices and Notices of Publicly Available Information were deficient and setting forth the remaining threshold until the attachment point is reached.

49. Although RBC had already complied fully with its obligations under the ISDA Master Agreements, in that same April 24 letter RBC provided LaCrosse with additional information regarding the Credit Event Notices and Notices of Publicly Available Information, which was not required, but which RBC sent for the purpose of clarifying purported discrepancies identified by LaCrosse in an effort to resolve this dispute and to ensure that LaCrosse lived up to its contractual obligations. As of the date of these Counterclaims, LaCrosse has not responded to the April 24 letter.

50. Upon information and belief, LaCrosse and MBIA have not only stated that they are not obligated to pay and will not pay the amounts that will soon become due and owing to RBC under the ISDA Master Agreements and Financial Guaranty Policies at issue, but are engaging in a pattern and practice of refusing to pay amounts which will become due and owing to other counterparties to similar transactions.

51. RBC's total damages arising from Plaintiffs' respective breaches of the ISDA Master Agreements and Financial Guaranty Policies, including any mark to market payments that would be due under the ISDA Master Agreements and Financial Guaranty Policies on an early termination, will exceed $2,000,000,000 (two billion dollars).

### FIRST COUNTERCLAIM
**(For Breach of Contract as Against Plaintiff LaCrosse)**

52. RBC repeats and realleges each and every allegation set forth above.

53. RBC and LaCrosse entered into three ISDA Master Agreements.

54. Under each ISDA Master Agreement (Master Agreement I, Master Agreement II, and Master Agreement III) RBC is obligated, inter alia, to make Fixed Amount Payments to

LaCrosse, and LaCrosse has, <u>inter</u> <u>alia</u>, a corresponding obligation to pay to RBC Cash Settlement Amounts once the attachment point is reached, provided that RBC has complied with certain notice requirements set forth in the ISDA Master Agreements.

55. RBC has made and continues to make the requisite periodic payments required under the ISDA Master Agreements.

56. RBC further provided to LaCrosse the requisite Credit Event Notices and Notices of Publicly Available Information upon the occurrence of each Credit Event and will continue to do so as Credit Events occur.

57. In breach of the ISDA Master Agreements, and despite RBC's performance of all of its obligations thereunder, LaCrosse has stated that it is not obligated to pay and will not pay any Cash Settlement Amounts to RBC.

58. RBC's total damages arising from LaCrosse's breach of the ISDA Master Agreements exceed $2,000,000,000 (two billion dollars).

## SECOND COUNTERCLAIM
**(Breach of Covenant of Good Faith and Fair Dealing as Against Plaintiff LaCrosse)**

59. RBC repeats and realleges each and every allegation set forth above.

60. Implied in each of the ISDA Master Agreements is a covenant that the parties will deal with each other fairly and in good faith and will not engage in conduct designed to deprive each other of the benefits of the agreements.

61. From the time RBC and LaCrosse entered into the ISDA Master Agreements, RBC has faithfully performed its obligations thereunder.

62. RBC sent and continues to send the Fixed Amount payments to LaCrosse each quarter as set forth in each ISDA Master Agreement and LaCrosse accepted each of those payments.

63. Additionally, over a period of approximately eighteen months, RBC sent to LaCrosse the required Credit Event Notices and Notices of Publicly Available Information upon the occurrence of each Credit Event, for a total of over fifty such notices, each of which was accepted by LaCrosse.

64. After accepting RBC's Credit Event Notices and Notices of Publicly Available Information for approximately eighteen months, LaCrosse now objects to those notices as deficient in an obvious attempt to disclaim liability for the substantial Cash Settlement Amounts which will become due and owing under the ISDA Master Agreements.

65. LaCrosse's conduct is commercially unreasonable and deprives RBC of the benefit of the ISDA Master Agreements and RBC's longstanding and faithful compliance therewith.

66. Upon information and belief, LaCrosse's decision to object to the Credit Event Notices and Notices of Publicly Available Information (in addition to the commencement of this lawsuit) was a calculated plan to deprive RBC of the benefits of the ISDA Master Agreements, specifically the payment to RBC of Cash Settlement Amounts.

67. LaCrosse, by its actions, has violated the covenant of good faith and fair dealing owed to RBC under the ISDA Master Agreements.

68. As a direct and proximate result of LaCrosse's actions, RBC's damages will exceed $2,000,000,000 (two billion dollars).

### THIRD COUNTERCLAIM
### (For Breach of Contract as Against Plaintiff MBIA)

69. RBC repeats and realleges each and every allegation set forth above.

70. RBC and LaCrosse entered into three ISDA Master Agreements.

71. LaCrosse's obligation to pay Cash Settlement Amounts to RBC is insured by MBIA under three Financial Guaranty Insurance Policies, Guaranty Policy I, Guaranty Policy II, and Guaranty Policy III.

72. Under each of the Financial Guaranty Policies, MBIA is obligated to pay to RBC the respective Cash Settlement Amounts in the event that LaCrosse fails to pay those amounts, provided that RBC sends a Demand for Payment and an Assignment of Rights to MBIA.

73. In breach of the Financial Guaranty Policies, and despite RBC's performance of its obligations thereunder, MBIA has stated that it is not obligated to pay and will not pay RBC any Cash Settlement Amounts.

74. RBC anticipates that MBIA will continue to refuse to pay RBC the Cash Settlement Amounts that will become due and owing to RBC as additional Credit Events occur and as LaCrosse fails to pay the Cash Settlement Amounts due and owing in respect of those future Credit Events.

75. As a result of MBIA's breaches of the Financial Guaranty Policies, RBC's damages will exceed $2,000,000,000 (two billion dollars).

## **REQUESTS FOR RELIEF**

WHEREFORE, RBC respectfully requests the entry of judgment in its favor awarding compensatory damages in an amount to be determined at trial, but not less than $2,000,000,000 (two billion dollars).

Dated:    New York, New York
         June 17, 2009

                              CHADBOURNE & PARKE LLP

                              By_____/s/ Scott S. Balber_____
                                    Scott S. Balber (SB-5807)
                                    David LeMay*
                                    Emily Abrahams (EA-1996)
                                    A Member of the Firm
                              Attorneys for Royal Bank of Canada
                              30 Rockefeller Plaza
                              New York, New York  10112
                              (212) 408-5100
                              * Not admitted to the Bar of this Court